**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jaime Lopez CARRILLO,
Defendant–Appellant.**

**No. 87–1023.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 11, 1989.

Decided May 8, 1990.

John Trebon, Flagstaff, Ariz., for defendant-appellant.

Patrick Cunningham, Asst. U.S. Atty., Phoenix, Ariz., for plaintiff-appellee.

Before WRIGHT, HUG and LEAVY, Circuit Judges.

LEAVY, Circuit Judge:

Jaime Lopez Carrillo appeals from the order of the district court denying his motion to suppress evidence of his stop and subsequent arrest by law enforcement officials in a rural area approximately six hours after a light airplane carrying 700 pounds of cocaine had made a desert landing nine miles away. Carrillo argues on appeal that the police officers did not have reasonable suspicion to detain him, that he did not consent to the detention, that the detention exceeded the proper scope and length of a legitimate *Terry* stop, and that the officers did not have probable cause to arrest him. Carrillo also contends that reversal is required because a portion of the transcripts of the motion to suppress hearing were irretrievably lost. We affirm.

## FACTS AND PROCEEDINGS

On June 7, 1986, at approximately 8:25 p.m., a United States Customs airplane detected an unidentified aircraft twenty-nine miles southwest of Tucson, Arizona, flying without lights at a low altitude. At approximately 9:00 p.m., the aircraft touched down at a dirt landing strip thirteen miles southwest of Casa Grande, Arizona, and four miles from Interstate 8. The plane landed in the desert in the dark.

The crew of the Customs plane observed the aircraft and four ground vehicles in the landing strip area through the means of an infrared radar detection system. Two ground vehicles were seen at either end of the landing strip and two additional ground vehicles were observed approaching the aircraft. Five to ten minutes later, two ground vehicles and the airplane departed, at which time the vehicles were intercepted by a U.S. Customs helicopter. The occupants of the four vehicles fled by foot into the desert. The government agents were unable to obtain a description of any of the fleeing suspects.

At approximately 11:45 p.m., agents from the Arizona Department of Public Safety, the U.S. Customs Service, the Pinal County Sheriff's Department and the Drug Enforcement Agency cooperated in conducting an extensive search for the suspects in the area surrounding the landing strip. The officials believed the suspects were running through the shrubbery and hiding under it in order to avoid detection by the Customs helicopter which was using a spotlight in an attempt to locate the occupants of the vehicles.[1]

At 1:00 a.m. on June 8, 1986, Officers Knight, Gorski, and Renteria began a search of the general area in an unmarked police pick-up truck. The officers searched roads in the area of the airstrip, fanning out toward Casa Grande which is about 11.25 miles on a direct line from the airstrip. At approximately 2:50 a.m., the officers located Carrillo about nine and one-half air miles from the landing strip and one-half mile from Casa Grande city limits.

Deputy Knight of the Pinal County Sheriff's Department testified that he saw Carrillo come out from a crouched position behind a desert bush three to four feet high and flag down the unmarked vehicle after it had passed. The officers stopped the vehicle and backed toward Carrillo, who requested a drink of water and a ride to Casa Grande. The agents immediately identified themselves as police officers and began to question Carrillo concerning his presence in the rural, desert area in the middle of the night. Carrillo indicated that he had been "partying" with some ac-

---

1. The parties stipulated to the facts recited to this point for suppression hearing purposes only. The trial judge found these facts to be "substantially accurate."

quaintances and was later stranded after his pick-up truck broke down near a wash about ten miles away.

At the officers' request, Carrillo produced two drivers licenses, a duplicate and an original, showing Tucson, Arizona, as his permanent address. Carrillo indicated he was staying with his brother in Eloy, a small community several miles from Casa Grande. Carrillo told the three police officers that he had been unemployed for about one and one-half years. An American Express Card was noted in Carrillo's wallet. Carrillo was wearing tan corduroy pants, Reebock tennis shoes, a multicolored button down shirt, two gold chains and a ring made up of gold and diamonds.

The officers reported that Carrillo was breathing hard and appeared exhausted. His clothes were soiled and torn. Fresh scratches were noted on his arms and neck. Four or five minutes after he first encountered the police officers, Carrillo reported that he had attempted to pay other persons that passed him along the roadway twenty dollars to take him into town. Carrillo reported that he had run into the desert after one such passerby had attempted to rob him.

The officers told Carrillo they would help him locate his vehicle and requested that he get into the back of the police pick-up, which he did. Carrillo was joined in the back by Officers Renteria and Knight. Carrillo did not object to the search for his vehicle, although he was never told he was free to leave. They then proceeded to search for the truck based on Carrillo's directions for about fifteen minutes with no success.

The search took them in a westerly direction and at 3:05 a.m., the officers contacted Sergeant Stine, eventually meeting him at 3:15 or 3:20 a.m. about five road miles from where Carrillo was originally discovered. Sergeant Stine asked Carrillo for identification, at which time he noticed a title transferred in blank to a BMW automobile in Carrillo's wallet. A telephone pager was also found on Carrillo's waist bearing a Tucson telephone number. Upon being appraised of the information learned by the other officers and upon having detected no odor or evidence of alcohol on Carrillo's breath, Sgt. Stine formally arrested him at 3:30 a.m. No statements were thereafter taken from Carrillo.

On June 10, 1986, a criminal complaint was filed against Carrillo in the United States District Court for the District of Arizona. A detention hearing was held before Magistrate Megella on June 16, 1986, wherein probable cause was found and Carrillo was detained. By indictment of July 2, 1986, Carrillo, Terence E. Larue, Melvin L. Cox, and Norman O. Sublett, Jr., were charged with possession with intent to distribute and conspiracy to possess with intent to distribute 700 pounds of cocaine.[2]

Carrillo filed a motion to suppress evidence based on his arrest on June 8, 1986. The evidentiary hearing on that motion began on August 25, continued on August 27, and concluded on August 28, 1986. By written order on September 5, 1986, the district court denied Carrillo's motion to suppress. The court found that Carrillo's "condition, particularly the torn shirt, the dirt on his clothing and the state and extent of his exhaustion [were] more consistent with a much longer period of time in the desert than an effort to elude would-be robbers." The court also found that Carrillo's conduct in waiting four or five minutes before telling the officers of the attempted robbery was "more consistent with one trying to conjure a cover story for his presence in the desert under the circumstances in which the police found him rather than having been broken down and the victim of what he feared might be a robbery." The court concluded that when the officers stopped, Carrillo was under suspicion but not under arrest, that he consented to police assistance in the search for his truck, and that he was not formally arrested until 3:25 a.m. The court also found the stop was founded on reasonable suspicion and that Carrillo's subsequent arrest was supported by probable cause.

**2.** The charges against Larue, Cox, and Sublett were subsequently dismissed.

On October 21, 1986, the court reporter, Rosezell Huckaby, reported in open court that one complete audio tape of the suppression hearing had been lost. No court reporter, other than the tape recording, reported the suppression hearing. Carrillo thereafter moved to dismiss or in the alternative to preclude further witness testimony. Over Carrillo's objection, the district court allowed the government to supplement the record of the suppression hearing by recalling witnesses in order to reconstruct the lost testimony.

On November 11, 1986, a jury found Carrillo guilty on both counts of the indictment. On January 12, 1987, Carrillo was sentenced to two terms of twenty years to be served consecutively and a fine of $50,000. Carrillo thereafter timely appealed from his conviction and sentence.

## DISCUSSION

### I. LOST TRANSCRIPT

Tape 2 from the afternoon of August 27, 1986, has been identified as the missing tape. The missing testimony is that of defense witness John Christian, Carrillo's investigator, taken from 3:43 p.m. to 4:19 p.m., and 4:50 p.m. to 5:00 p.m. (a total of forty-six minutes), and part of the direct examination of prosecution witness Sgt. Stine from 4:19 p.m. to 4:50 p.m. (a total of thirty-one minutes). Deputy Knight was also recalled during this period to confirm that he had marked Exhibit 2 in black ink. Trial counsel for Carrillo believes that Officer Renteria testified during this period, although this is disputed by the government.

After hearing evidence from the court reporter and both parties, and proposing a reconstruction of the missing testimony, the trial court denied Carrillo's motion to dismiss or in the alternative to preclude further testimony. Following the trial, the court permitted further testimony from Deputy Knight, Sgt. Stine, and John Christian, and also supplemented Stine's suppression hearing testimony with his trial testimony.

Carrillo argues that his conviction should be reversed because he has suffered significant prejudice on appeal due to the loss of the tape. Specifically, Carrillo contends he is prejudiced because: (1) the testimony of Sgt. Stine during the post-trial proceedings was materially different from the testimony he offered during the original hearing on the motion to suppress;[3] and (2) he is represented by different counsel on appeal. Carrillo argues that at the very least, the case must be remanded for further proceedings before the district court to determine precisely whose testimony was lost, the quality of the testimony, and the resulting prejudice to Carrillo.

A criminal defendant has a right to a record on appeal which includes a complete transcript of the proceedings at trial. *Hardy v. United States*, 375 U.S. 277, 279–82, 84 S.Ct. 424, 426–28, 11 L.Ed.2d 331 (1964). Nevertheless, while court reporters are required by the Court Reporters Act, 28 U.S.C. § 753(b)(1) (1982), to record verbatim all proceedings in open court, their failure to do so does not require a per se rule of reversal. *United States v. Doyle*, 786 F.2d 1440, 1442 (9th Cir.), *cert. denied*, 479 U.S. 984, 107 S.Ct. 572, 93 L.Ed.2d 576 (1986) (citations omitted). Rather, some prejudice to the defendant must occur before reversal will be contemplated. *Id.*

The Ninth Circuit has not yet articulated a precise standard of review for prejudice where a portion of the trial transcript has been lost. The government urges the adoption of the Fourth Circuit standard for prejudice: "[t]he appellant must demonstrate that the missing portion of the transcript specifically prejudices his appeal before relief will be granted." *United States v. Gillis*, 773 F.2d 549, 554 (4th Cir.1985).

We adopted a similar "specific prejudice" standard in *United States v. Anzalone*, 886 F.2d 229, 232 (9th Cir.1989), wherein the defendant alleged inaccurate recording and

---

**3.** Carrillo's trial counsel submitted an affidavit in which he states that the "recreated" testimony "was much less damaging to the prosecution's position (that Carrillo was not arrested immediately upon being stopped) the second time around."

transcription of the first four days of trial. The trial court found that the transcripts, while of poor quality, reported the proceedings with reasonable completeness and substantial accuracy. The trial judge further stated that he found no errors or omissions that would in any degree prejudice the defendant on appeal. *Id.*

■ On appeal, we noted that "[a]lthough this court has not expressly stated the standard of review for this type of claim, a trial court's factual finding that transcripts are accurate and complete cannot be disturbed unless clearly erroneous." *Id.* (citing *Maine v. Taylor*, 477 U.S. 131, 144–45, 106 S.Ct. 2440, 2450–51, 91 L.Ed.2d 110 (1986)). "[A]ssuming there were omissions in the transcripts, appellant cannot prevail without a showing of specific prejudice." *Id.* If the trial court's certification that the transcripts are accurate and complete is not clearly erroneous, no "specific prejudice" can be shown. *Id.* We adopt this statement for purposes of this appeal.

Following the hearing to reconstruct the lost testimony, the trial court found that there were "no relevant or material parts of Sergeant Stine's testimony on August 27th which are not now fully of record as a result of [the supplemental hearing] and his hearing at trial." The court also found that there was "nothing of any material or relevant sense that is not now of record" in referring to the reconstruction testimony of Mr. Christian. The trial judge concluded: "I further find that nothing that I have heard today, whether it was evidence previously offered or new evidence, would in any way alter my findings, conclusions, or rulings on the motion to suppress made by defendant Carrillo, and I reaffirm those findings, conclusions and decision."

■ Applying the standards articulated in *Gillis* and *Anzalone*, Carrillo has presented no evidence which suggests that the trial court's finding that the recreated testimony was essentially accurate and complete was clearly erroneous. In addition, the district court's minutes indicate that Officer Renteria did not testify on August 27, 1986, and Carrillo has not presented any evidence to the contrary, nor

does he claim prejudice due to the alleged loss of that testimony. Carrillo has not shown that the trial court's certification was clearly erroneous nor has he shown specific prejudice on appeal. Not only did the district court find the reconstructed record complete, it reaffirmed its findings, conclusion, and decision on the motion to suppress. We thus have before us the ruling and record on which it was based. We consider it insignificant in this context that Carrillo is represented by different counsel on appeal. Accordingly, we turn now to the merits.

## II. DENIAL OF MOTION TO SUPPRESS

Carrillo contends that he was detained without reasonable suspicion, held beyond the permissible scope of such detention, and that his subsequent arrest was made without probable cause.

### A. Terry Stop

■ The United States Supreme Court has held that it is not unreasonable under the fourth amendment for a police officer to make a brief detention of a person based on a reasonable suspicion that the person is engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). Such an investigatory stop may also be premised on a reasonable suspicion that the person is wanted for past criminal activity. *United States v. Thomas*, 863 F.2d 622, 625 n. 3 (9th Cir.1988) (citing *United States v. Cortez*, 449 U.S. 411, 417 n. 2, 101 S.Ct. 690, 695 n. 2, 66 L.Ed.2d 621 (1981)).

In evaluating the lawfulness of the investigatory stop, "the 'totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.' Founded suspicion must exist at the time the officer initiates the stop." *Id.* (quoting *Cortez*, 449 U.S. at 417–18, 101 S.Ct. at 694–95). Whether there was founded suspicion to justify an investigatory stop is a mixed question of

law and fact which requires de novo review. *Id.* (citation & footnote omitted).

■ The police had reasonable suspicion to detain Carrillo after he flagged them down. The officers who spotted Carrillo knew that several persons had fled into the desert after law enforcement officials intercepted an aircraft which contained 700 pounds of cocaine. While Carrillo was located nine air miles from the landing strip, it was not impossible for someone to travel that distance by foot in five to six hours. Carrillo also acted suspiciously by hiding in the brush and waiting to identify the vehicle before flagging it down for a ride. Once stopped, the officers noted that Carrillo was exhausted and that his clothes were torn and soiled. Under these facts, the officers had reasonable grounds to suspect that Carrillo was involved in the drug smuggling and that further investigation was necessary.

Carrillo also argues that the officers interrogated and detained him beyond the permissible scope of a *Terry* stop. Carrillo contends that once the government obtained his name and identification, he should have been transported to Casa Grande as requested rather than forced to ride in the truck with the officers to search in complete darkness for his lost truck.

■ The district court found that Carrillo "made no objection to and by his conduct consented to [the police officers'] assistance to help him search for his vehicle." We review the district court's determination as to the voluntariness of consent de novo, while the findings of fact surrounding the incident are reviewed for clear error. *See United States v. Crespo de Llano*, 830 F.2d 1532, 1541 & n. 2 (9th Cir. 1987) (citing *United States v. Wolf*, 813 F.2d 970, 974 (9th Cir.1987)). Consent is voluntary if it is freely given and is not the product of duress or coercion, and is measured by the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2058–59, 36 L.Ed.2d 854 (1973).

■ The evidence supports the district court's conclusion that Carrillo voluntarily agreed to join the officers in the truck. At no point did the officers draw their weapons, and there are no allegations they verbally or physically threatened or harassed Carrillo. Rather, they merely offered their assistance in locating his car, which Carrillo willingly accepted. Accordingly, Carrillo was not unlawfully detained or interrogated.

*B. Probable Cause to Arrest*

Carrillo argues that he was seized or arrested within the meaning of the fourth amendment once he consented to accompany the officers on the search for his disabled vehicle, and that the arrest was not supported by probable cause.

■ In order to determine whether probable cause existed to arrest Carrillo, the court must first determine the point at which the arrest took place. The district court concluded "that by the time the officers met Sgt. Stein [sic] at approximately 3:15 to 3:20 a.m. [Carrillo] was under detention and that he was formally arrested at approximately 3:25 a.m." The district court's determination as to the time of arrest will be upheld unless it is clearly erroneous. *United States v. Pinion*, 800 F.2d 976, 978 (9th Cir.1986), *cert. denied*, 480 U.S. 936, 107 S.Ct. 1580, 94 L.Ed.2d 770 (1987). "A defendant is in custody when, based upon a review of all the relevant facts, 'a reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave.'" *Id.* at 978–79 (quoting *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir.1981)).

■ Once again, the evidence supports the district court's conclusion that Carrillo voluntarily agreed to join the officers and that he was not arrested until 3:25 a.m. Up until Sgt. Stine formally arrested him, a reasonable innocent person in Carrillo's shoes would have felt he was free to leave. Despite the fact Carrillo was never specifically informed that he was free to leave, Officer Knight testified that "[w]e'd have let [him] walk if he wanted to walk."

■ Having determined he was not arrested until 3:25 a.m., Carrillo's "warrantless arrest was legal only if, at the moment of arrest, facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that the suspect had committed ... an offense." *Pinion,* 800 F.2d at 979 (citation omitted). The ultimate question whether probable cause exists is a mixed question of law and fact which is reviewed de novo. *Id.* The district court's findings on the underlying facts are reviewed under the clearly erroneous standard. *Id.*

■ Carrillo was arrested on the basis that he was wandering on foot in the desert in the middle of the night nine air miles from the airstrip in a soiled and tattered state; he was wearing expensive clothes and jewelry, had an American Express card, and title to a BMW and yet he had been unemployed for one and one-half years; he did not smell of alcohol and his truck could not be located; and finally, he carried a pager with a Tucson telephone number. Under the circumstances, this information was sufficient to rebut Carrillo's proffered explanation for his presence in the desert and to give the police probable cause to arrest him for drug smuggling.[4]

AFFIRMED.

---

**4.** Carrillo's reliance on *United States v. Webster,* 750 F.2d 307 (5th Cir.1984), *cert. denied,* 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985), is misplaced. While factually similar, in *Webster,* the police officer arrested the defendant without even questioning him or asking him for identification. No attempts were made to discover why the defendant had spent the night in the woods; he was simply driven to the police station and arrested. In this case, however, the officers questioned Carrillo and attempted to verify his story prior to arresting him. Thus, Carrillo's arrest was not based "solely on (1) presence in the general vicinity of a crime hours after its commission; (2) while wearing muddy clothes; and (3) acting in an unusual manner." *Id.* at 324. Accordingly, unlike *Webster,* the arrest in this case was based on probable cause.