**UNITED STATES of America, Plaintiff,**

**v.**

**$75,040.00 IN UNITED STATES CURRENCY, in rem, Defendant.**

Civ. No. 90–0236–BE.

United States District Court, D. Oregon.

June 10, 1991.

Charles H. Turner, U.S. Atty., D.Or., Leslie J. Westphal, Asst. U.S. Atty., Portland, Or., for plaintiff.

Santiago E. Juarez, Juarez Law Office, P.S., Seattle, Wash., Charles G. Duncan, Eugene, Or., for claimant Juan Ortiz.

## OPINION

BELLONI, District Judge.

This is a civil forfeiture action. The plaintiff, the United States of America, has moved for summary judgment and the claimant, Juan Ortiz, has made a cross-motion for summary judgment and to suppress evidence. The court held an eviden-

tiary hearing with respect to the motion to suppress on March 18, 1991.

As a practical matter, the court must determine what evidence is admissible before addressing the motions for summary judgment. Therefore, the court will deal with the motion to suppress before turning to the motion for summary judgment.

## I. MOTION TO SUPPRESS

■■■ Although forfeiture actions are generally civil in form, they are "quasi-criminal" in nature. Therefore, the exclusionary rule prohibits the government from using evidence obtained in violation of the Fourth Amendment to prove a forfeiture. *United States v. One 1977 Mercedes Benz 450SEL*, 708 F.2d 444 (9th Cir.1983), *cert. denied*, 464 U.S. 1071, 104 S.Ct. 981, 79 L.Ed.2d 217 (1984). A prior determination regarding admissibility in a related criminal proceeding is binding in a forfeiture action. In a case such as this one, where no criminal charges are pursued, the court may take evidence and determine a motion to suppress by the claimant.

### 1. *Findings of Fact*

At the evidentiary hearing, Oregon State Troopers Lacey Bettis and Kevin Bennett and Douglas County Deputy Marvin Gish testified on behalf of the government. Ortiz testified and also submitted an affidavit to the court. The court makes the following findings of fact with respect to the motion to suppress.

Shortly after 1:00 a.m. on May 23, 1989, State Trooper Lacey Bettis observed a 1989 Dodge Daytona traveling south on I–5 in Southern Oregon, approximately 113 miles north of the California border. Bettis observed that the Dodge was traveling 55 miles per hour in a 50 mile zone, and that the Dodge was weaving in a manner that made her suspicious that the driver was under the influence. After following the Dodge for several miles, Bettis pulled it over at 1:11 a.m.

Bettis told the driver, claimant Juan Ortiz, that he had been stopped for speeding and for swerving while driving. Bettis asked if Ortiz had been drinking. Ortiz said he hadn't, but that he was tired and looking for a motel.

Ortiz provided a driver's license and registration. The Dodge was registered to Jesus G. Mendoza of Seattle, Washington, who Ortiz identified as a friend. Ortiz explained that he had borrowed the vehicle to go on vacation with the passenger, Sylvia Ponce. Ortiz was evasive regarding his destination and length of trip, but then said that they were going to California for about a week. The Dodge was a hatchback, and Bettis noticed that there were only two tote bags, which she considered to be inconsistent with a week's luggage for two people.

Bettis checked the driver's license and registration, and then turned off the overhead lights on the patrol car. Bettis had Ortiz exit the Dodge and gave Ortiz some coordination tests so that she could determine whether he was intoxicated. Bettis determined that Ortiz did not appear to be under the influence of intoxicants.

During this time, Deputy Gish drove by and pulled over to see if Bettis needed assistance. Bettis told him that she was about to conclude a traffic stop, and that she was going to attempt to get consent to search the vehicle. Bettis handed back the license and registration to Ortiz, and told him that she was not going to issue a citation and that he was free to leave. Up to this time, Ortiz conversed freely in English and appeared to have no problem understanding Bettis.

Before Ortiz returned to his car, Bettis asked him if she could ask him some questions, and Ortiz nodded. Bettis asked several questions, including whether there were any drugs, guns or cash in the vehicle. Ortiz answered "no." Bettis asked if Ortiz minded if she searched the Dodge. Ortiz asked why, and Bettis explained that she was looking for drugs, guns and cash. Ortiz seemed hesitant, and Gish, who is conversant in Spanish, repeated the explanation in Spanish. Ortiz said that he did not have those things, and gave permission to search the car. Gish asked Ortiz to open the hatchback, and for the passenger to

leave the car, and Ortiz and the passenger complied.

In his affidavit, Ortiz gave a different version of this exchange, stating that when Bettis asked him about drugs, money and guns, he said "no" and refused permission to look in the car. Bettis then asked again, Ortiz answered "no" again, and Bettis asked "why don't you want me to look in the car?" Ortiz said that he didn't want her to. The affidavit states that his driver's license had not yet been returned. Another officer arrived and asked the same questions, to which Ortiz again answered "no." The female officer said something about "we can look anyway because of the judge," and Ortiz replied, "then in that case do it."

However, during the evidentiary hearing Ortiz testified that the questions and answers were as described by Bettis and Gish. Therefore the court accepts the version of the conversation established at the hearing. In light of the discrepancies between his affidavit and his testimony at the hearing, the court finds that Ortiz' credibility is suspect, and accepts Bettis' testimony that she returned the license and registration to Ortiz before asking to search.

During the search Gish, Ortiz and the passenger stood at the right front of the Dodge. Bettis found a plastic bag under the driver's seat, and could see that the bag contained currency. Bettis searched the two tote bags, and found a partially opened brown paper bag in one of them which contained more currency and a letter from the DEA regarding a previous seizure from Ortiz. A canister containing white powder was found, but the tests on this substance were inconclusive. Bettis then radioed for a narcotics detection dog and replaced the bags containing currency in the positions where they were found.

Bettis testified that she found the currency at about 1:17 a.m., and that Trooper Bennett arrived with the narcotics canine about 15 minutes later. Ortiz stated in his affidavit that the stop lasted about one hour before Gish arrived, and that it took another half hour for Bennett to arrive with the dog after Bettis called for him.

Ortiz did not testify as to time periods at the hearing. The court finds that Ortiz' statement that the traffic stop lasted about an hour is not credible, and accepts the more specific times to which Bettis testified.

While waiting for Bennett, Gish asked why Ortiz had so much money, and Ortiz responded that a friend had given it to him to give to another person. Ortiz also stated that he worked in a Mexican restaurant and that he was to be paid for delivering the money. After Bennett arrived, the narcotics canine, "Mac," alerted to the plastic bag and to the paper bag in one of the tote bags. Bennett told Ortiz that they were going to seize the currency and that Ortiz could get a receipt if he followed them to the police station in Roseburg. Ortiz followed in his own car, and waited outside where Bettis told him to park. The officers gave Ortiz a receipt for $75,040 approximately two hours later, and he left.

The currency was packaged in bundles of $1,000, which were in turn grouped in amounts of $2,000 to $5,000. The plastic bag contained $16,020 and the paper bag contained $59,020.

## 2. *Discussion*

Ortiz contends that the evidence regarding the currency and his statements should be suppressed because the initial stop was a mere pretext for the search of the Dodge. He contends that Bettis did not have reasonable suspicion justifying her questions and the request to search the Dodge.

Ortiz next contends that he did not voluntarily consent to the search of the Dodge, due to the coercive circumstances and his difficulty in communicating. Ortiz argues that he did not feel free to leave and that he did not understand that he could refuse to answer questions. Ortiz also argues that the search exceeded the scope of any consent, which did not extend to the canine search. Finally, Ortiz contends the length of the stop constituted an arrest without probable cause.

The government contends that the initial stop was a valid traffic stop and not based

on a pretext. The government argues that Bettis did not need reasonable suspicion in order to ask for consent to search the Dodge. The government contends that Ortiz was able to communicate and understand what was happening; that he consented to the search of the Dodge; and that the entire process consumed a reasonable time. The government contends that Ortiz was not placed under arrest, either officially or *de facto*.

■ The evidence does not support Ortiz' contention that the initial stop was based on a pretext. The behavior of Bettis was consistent with a normal traffic stop to investigate speeding and suspected intoxication. The fact that Bettis did not issue any citation does not mean that the stop was a mere pretext. *See United States v. Baker*, 850 F.2d 1365, 1368 (9th Cir.1988).

The initial stop took only a few minutes. Bettis was satisfied that Ortiz was not under the influence of intoxicants, but suspected that Ortiz might be a drug or money courier. Bettis concluded the stop by returning the license and registration and telling Ortiz that he was free to leave. The initial stop did not exceed the brief investigatory detention contemplated by *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968).

The question, then, is whether the questions regarding drugs and the request for consent to search constituted a second stop which required reasonable suspicion. Not every police encounter is a seizure as defined by the Fourth Amendment. *United States v. $25,000 U.S. Currency*, 853 F.2d 1501, 1504 (9th Cir.1988). An encounter becomes an investigatory stop only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). The fact that an officer asks a question and that a person chooses to cooperate does not, in itself, imply that the person has been subjected to a stop. *Id.* at 555–556, 100 S.Ct. at 1877–1878. A consent search is lawful if the consent is voluntary under the totality of the circum-

stances and not the product of duress or coercion. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248, 93 S.Ct. 2041, 2058, 36 L.Ed.2d 854 (1973).

■ Ortiz argues that the facts surrounding the questions and request to search were so coercive that he reasonably felt that he was not free to leave or to refuse the search. The facts argued by Ortiz are not supported by the evidence. Bettis turned off the flashing lights of the patrol car before the traffic stop was concluded. Bettis told Ortiz that she was not going to issue a citation, returned his documents to him, and told Ortiz that he was free to leave. The court does not accept Ortiz' argument that he was not able to understand what the officers asked him. First, Ortiz was able to communicate adequately in English until Bettis began to ask him about drugs, guns and currency. Second, Gish was able to communicate with Ortiz in Spanish.

The Ninth Circuit has found that a defendant was free to leave under more inherently coercive circumstances, where the defendant was riding in a police vehicle, and where he was never told that he was free to leave. *United States v. Carrillo*, 902 F.2d 1405, 1411 (9th Cir.1990). This court has found, under very similar facts, that once a driver is told that he is free to leave following a traffic stop, his choice to stay and answer further questions does not transform the encounter into an involuntary stop if there are no other coercive circumstances. *United States v. $28,980 in U.S. Currency*, 786 F.Supp. 899, 903 (D.Or.1990) (Belloni, J.).

There are no circumstances in this case that transform the encounter into an involuntary stop. Further, the facts do not support Ortiz' claim that his consent was not voluntary under the totality of the circumstances.

■ Ortiz next contends that the search exceeded the scope of any consent, which did not extend to the search by the narcotics canine. Bettis discovered the plastic bag under the driver's seat while within the

reasonable scope of the consent to search the car. Bettis could see that the plastic bag contained a large amount of currency.

The search of the tote bags was also within the scope of the consent. The Supreme Court recently held that consent to search a car for drugs includes consent to search any containers within the car which might bear drugs. *Florida v. Jimeno,* —— U.S. ——, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). In *Jimeno,* the police believed that the defendant had participated in a drug transaction. The police followed Jimeno and stopped him after observing a traffic violation. After dealing with the violation, the officers told Jimeno they suspected that he had drugs in the car and asked for consent to search the car. Jimeno consented, and the officers found drugs in a paper bag lying on the floor of the car. The Court distinguished this situation from a situation in which a locked briefcase was found inside a car. In such a case, the Court reasoned that consent to search a car would not reasonably extend to breaking open a locked container.

In this case, Bettis made it clear that she wanted to search for drugs, currency and guns. Thus, the scope of the consent extended to any containers in the Dodge which could be expected to hold such items, including the tote bags. There is no evidence that the tote bags were locked, or that Bettis damaged them in any way.

■■■ The discovery of large amounts of currency in the Dodge, packaged in a fashion commonly used by drug traffickers, gave rise to a reasonable suspicion that the currency was involved with drug trafficking and, consequently, forfeitable. Reasonable suspicion was also supported by the fact that the Dodge was not registered to either of its occupants; that the Dodge was headed south on I-5 into California, a common courier route; and that the Dodge contained little luggage for a trip out of state. These factors justified detaining Ortiz in order to conduct a further investigatory stop while a narcotics canine searched the vehicle. *See United States v. Malone,* 886 F.2d 1162, 1165 (9th Cir.1989) (airport search of suspected drug courier).

■■ Ortiz contends that the extensive length of time that he was detained constituted an arrest without probable cause. The facts do not support Ortiz' claim that he was detained for an unreasonable time. Bettis stopped the Dodge at 1:11 a.m., and radioed for the narcotics canine at 1:17 a.m. Bennett and Mac arrived about 15 minutes later. After the canine search, Bennett informed Ortiz that he was seizing the money, and gave Ortiz the choice of following him to the police station in Roseburg. Thus, the entire encounter on the highway lasted approximately one half hour. This is not an unreasonable period of time for an investigative stop, particularly when a portion of the time is spent on a consent search.

■■■ At the end of the highway stop, Bennett had probable cause to believe that Ortiz was a drug/money courier and that the currency was forfeitable. In addition to the factors listed above, the search had revealed a canister containing a white powder and a letter from the DEA referring to a prior forfeiture action involving Ortiz. Although the tests on the powder were inconclusive, these factors helped to create probable cause based on the officers' knowledge at the time. Even stronger support for probable cause was supplied by Ortiz' statements that he was delivering the money to someone in California and that he expected to be paid.

Ortiz testified that he felt free to leave at the end of the highway stop, and that he chose to follow the officers to Roseburg to get a receipt. Ortiz drove his own car and waited outside the Roseburg police station. These facts do not support a finding that Ortiz was in custody, much less under arrest during the time that the officers were counting the money and preparing a receipt. *See Carrillo, supra,* 902 F.2d 1405.

For all of the above reasons, Ortiz' motion to suppress is denied.

## II. MOTIONS FOR SUMMARY JUDGMENT

Ortiz and the government make cross-motions for summary judgment. In light

of the denial of Ortiz' motion to suppress, his motion for summary judgment must also be denied. The government has presented evidence which could satisfy its burden to show probable cause for the forfeiture of the currency. This evidence includes the possession of such a large amount of currency, the alert by the narcotics canine, Ortiz' statements that he was delivering the money to a third party and that he expected to be paid for this service, the discovery of the white powder, the letter from the DEA, and the factors consistent with the modus operandi employed by drug/money couriers. Therefore, Ortiz's motion for summary judgment is denied.

█ In its motion for summary judgment the government argues first that Ortiz lacks standing because he has stated that he was delivering the currency to someone in California. However, Ortiz has asserted a possessory interest in the currency, which is adequate to establish his standing as a claimant. It is not necessary that a claimant prove outright ownership of the defendant property. A lesser property interest, such as possession, creates standing in a forfeiture action. *United States v. 1982 Sanger 24' Spectra Boat,* 738 F.2d 1043, 1046 (9th Cir.1984).

The more substantial contention of the government concerns Ortiz' ability to show either that the currency is not forfeitable or that he has a defense to forfeiture. In civil forfeiture actions there is a shifting burden of proof at trial and on a motion for summary judgment. 19 U.S.C. § 1615; *United States v. Padilla,* 888 F.2d 642, 643 (9th Cir.1989). The government must make an initial showing that there is evidence which could support a finding of probable cause to forfeit the defendant. If the government submits such evidence, the burden shifts to the claimant to submit evidence that the defendant is not subject to forfeiture. *United States v. $5,644,540 in United States Currency,* 799 F.2d 1357, 1362 (9th Cir.1986).

█ In this case, the government has met its burden to produce evidence which could establish probable cause for forfeiture. The claimant must then produce evidence which could meet his burden of showing that the currency is not forfeitable or that there is a defense to forfeiture. Ortiz has submitted no evidence that could meet this burden, other than the bald statement that he has a right to the currency. Ortiz asserted his Fifth Amendment privilege and refused to answer virtually all of the questions posed to him in discovery.

█ A claimant may not avoid his burden on a motion for summary judgment simply by asserting the Fifth Amendment. *United States v. Rylander,* 460 U.S. 752, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983). The Fifth Amendment does not prevent a court from drawing a negative inference against a party to a civil action who refuses to testify in response to probative evidence offered against him. *Baxter v. Palmigiano,* 425 U.S. 308, 318–19, 96 S.Ct. 1551, 1557–58, 47 L.Ed.2d 810 (1976). Although this court could not draw a negative inference from Ortiz' refusal to testify in a criminal case, and could not force Ortiz to waive his Fifth Amendment privilege in this case, this court cannot excuse Ortiz from his obligation to submit probative evidence in support of his civil forfeiture claim. *Baker v. United States,* 722 F.2d 517, 518 (9th Cir.1983).

Thus, Ortiz has failed to submit evidence which could meet his burden to show that the currency is not forfeitable or that there is a defense to forfeiture. The government's motion for summary judgment is granted.

### CONCLUSION

Ortiz' motion to suppress is denied. Ortiz' motion for summary judgment is denied. The United States' motion for summary judgment is granted. Judgment will be entered in favor of the United States.